# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff-Respondent,              Criminal Case No. 13-20314
                                   Civil Case No. 15-14290
                                   HON. DENISE PAGE HOOD

v.

ROBBY NAKIA HARRIS,

      Defendant-Petitioner.

_____/

**ORDER DENYING MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET
ASIDE OR CORRECT SENTENCE [#54];
ORDER DISMISSING CIVIL CASE NO. 15-14290;
and
ORDER DENYING CERTIFICATE OF APPEALABILITY**

## I. BACKGROUND

On October 31, 2013, a jury found Defendant Robby Nakia Harris ("Harris")

guilty on one count of Mailing Threatening Communications in violation of 18

U.S.C. § 876(c) for mailing a threatening letter to United States Congresswoman

Candice Miller ("Miller").   (Doc # 35)   Harris was sentenced to a term of 30

months of imprisonment, followed by a term of 1 year of supervised release.  (Doc

# 41)  Harris filed a Notice of Appeal on March 10, 2014.  (Doc # 42)  On May 13,

2015, the Sixth Circuit issued an Opinion affirming Harris' conviction and

sentence.  (Doc # 51)  The Sixth Circuit issued a Mandate on June 4, 2015.  (Doc #

2:13-cr-20314-DPH-MAR   Doc # 65   Filed 03/22/17   Pg 2 of 20   Pg ID 716

52)  Harris did not appeal to the Supreme Court.  On December 9, 2015, Harris filed the instant Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255 on the basis of ineffective assistance of counsel and prosecutorial misconduct.  (Doc # 54)  Harris filed a Supplemental Brief on April 25, 2016. (Doc # 60)  The Government filed a Response on July 11, 2016.  (Doc # 64)

## II. ANALYSIS

### A. Standard of Review

Section 2255 authorizes a federal prisoner to move the district court to vacate a sentence.  28 U.S.C. § 2255(a).  Motions brought under Section 2255 are subject to a one-year limitations period established by the Antiterrorism and Effective Death Penalty Act of 1996, generally running from "the date on which the judgment of conviction becomes final."  28 U.S.C. § 2253(f)(1); *Dunlap v. United States*, 250 F.3d 1001, 1004-05 (6th Cir. 2001).  As an initial matter, the Court notes that Harris' Motion was timely filed well within the limitations period.

Under the Sixth Amendment, a defendant has a right to "have the Assistance of Counsel for his defense."  U.S. Const. Amend. VI.  A defendant has a right to "reasonably effective assistance of counsel."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  In *Strickland*, the Supreme Court articulated a two-prong test to show ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious

2

> that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown of the adversary process that renders the result unreliable.

*Id.* "There is a strong presumption that legal counsel is competent. *United States v. Osterbrock*, 891 F.2d 1216, 1220 (6th Cir. 1989). In addition, a "reviewing court must give a highly deferential scrutiny to counsel's performance." *Ward v. United States*, 995 F.2d 1317, 1321 (6th Cir. 1993). "The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The defendant bears the burden of showing that counsel was so deficient and that prejudice resulted from counsel's errors. *Id.* at 686-87.

## B. Competence to Stand Trial

Harris first argues that Defense Counsel was ineffective because he failed to obtain a second opinion regarding Harris' competence to stand trial, and because he failed to properly appeal the decision of this Court that Harris was competent to

stand trial. Harris argues that, because of his extensive psychiatric history and the finding that he had been incompetent ten years earlier, the likelihood is high that another expert would have determined that he was incompetent in 2013—in which case he would not have had to stand trial and would have avoided the risk of a conviction. Harris further argues that a second opinion might have supported the argument for downward departure at sentencing and might have resulted in a lower sentence.

The Government argues that Harris has not presented clear and convincing evidence to rebut this Court's factual finding that Harris was competent to stand trial. The Government argues that Harris' arguments are purely speculative, and that there is no evidence that a second evaluation would have contained different results or would have justified a further reduction in Harris' sentence.

Prior to trial, Defense Counsel raised the issue of Harris' competence to stand trial, and Magistrate Judge Steven Whalen ordered a competency evaluation. (Doc # 9) The evaluation was conducted in February and March 2013 by two psychologists employed by the Federal Bureau of Prisons. The evaluation report submitted to the court concluded that Harris presented with a mental disease, but that he did have the capacity to assist legal counsel in his defense, and could rationally make decisions regarding legal strategy. (Doc # 22-1) Magistrate Judge Whalen found Harris to be presently suffering from psychotic disorder, NOS;

4

borderline intellectual functioning; and borderline personality disorder. (Doc # 13) Notwithstanding his diagnoses, Magistrate Judge Whalen found Harris to be competent to stand trial after reviewing the evaluation report and conducting a competency hearing on April 24, 2013. *Id.*

Defense Counsel appealed, and this Court held a hearing on October 23, 2013. During the hearing, the Court inquired whether the parties had considered obtaining a second evaluation. (Doc # 45, Pg ID 197, 205) Both parties indicated that they would have no objection but also expressed concern about continuing to delay the trial because Harris had already been in custody for a year. Defense Counsel also acknowledged that if the Court were to find Harris incompetent, the Court would commit Harris to the custody of the Attorney General, in accordance with 18 U.S.C. § 4241. *Id.* at 198-200. Defense Counsel acknowledged that Harris would then be hospitalized in a suitable facility for a reasonable period of time not to exceed four months as necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward, or for the pending charges to be disposed of according to law. *Id.* at 200-01. The Court indicated that it would review the curriculum vitae of the initial evaluator and would then make a determination of whether a second evaluation was needed. *Id.* at 208-09. On October 28, 2013, this

Court entered an Order finding Harris competent to stand trial and affirming Magistrate Judge Whalen's Order.  (Doc # 30)

After the trial, Defense Counsel proffered the initial evaluation report at the sentencing hearing and argued for a reduced sentence based upon Harris' mental competency.   The Court sentenced Harris to the lowest end of the applicable sentencing guideline range.

After reviewing the parties' arguments, briefs, and the record, the Court concludes that Defense Counsel's performance with regards to the issue of mental competency was reasonable.  Harris presents no evidence that a second evaluation in 2013 would have found him incompetent or would have justified a further reduction in Harris' sentence.   Harris points only to his "extensive psychiatric history" and a previous finding of incompetence preceding this Court's finding by a decade.  These were facts that Magistrate Judge Whalen and this Court already considered when making the determination that Harris was competent to stand trial in 2013.  Defense Counsel did appeal Magistrate Judge Whalen's initial decision, and this Court finds that Defense Counsel then made a strategic decision not to further appeal the decision of this Court and proceed to trial, as well as to then rely on the initial evaluation report at sentencing.

Under these facts, the Court concludes that Harris has not met his burden of showing that Defense Counsel's performance was constitutionally deficient, or that

6

there is a reasonable probability that, but for Defense Counsel's unprofessional errors, the result of the proceeding would have been different.

## C. Handwriting Investigation

Harris next argues that Defense Counsel was ineffective because he failed to investigate whether the prosecution had obtained a handwriting analysis, and because he failed to engage his own expert to take exemplars from Harris and compare them to the handwriting in the letter at issue to Congresswoman Miller, as well as to other letters in evidence. Harris argues that he was prejudiced because there was a genuine jury question as to whether he was actually the writer of the letter to Congresswoman Miller.

The Government argues that Defense Counsel did investigate the handwriting on the various letters, having been provided with several reports concerning the handwriting of Harris, the love letters allegedly written by Harris to his neighbor, and earlier writing samples belonging to Harris. The Government argues that the decision not to seek additional handwriting analysis was a conscious trial strategy decision made by Defense Counsel. The Government further argues that based upon the forensic reports, testimony of several witnesses, and the very distinctive style and form of Harris' writing, further investigation of Harris' handwriting would not have caused the jury to return a different verdict.

As the Supreme Court explained in *Strickland*,

> counsel has a duty to make reasonable investigations or to make a
> reasonable decision that makes particular investigations unnecessary.
> In an ineffectiveness case, a particular decision not to investigate must
> be directly assessed for reasonableness in all the circumstances,
> applying a heavy measure of deference to counsel's judgments.

466 U.S. at 691. If defense counsel has reason to believe that pursuing certain investigations would be fruitless or even harmful, failure to pursue those investigations may not later be challenged as unreasonable. *See id.*

At trial, the Government sought to prove that Harris wrote the letter to Congresswoman Miller, eliciting testimony from three witnesses—FBI Special Agent Juan Herrera ("Herrera"), Harris' neighbor Cynthia Hiller ("Hiller"), and postal carrier Theresa Orsette ("Orsette")—each of whom identified Harris as the author of the letter based on their familiarity with his handwriting, as well as the style and form of his writing. Hiller and Orsette testified that Orsette had previously given Hiller a threatening letter addressed to United States Senator Debbie Stabenow bearing Hiller's return address and written in distinctive handwriting, which Orsette recognized as Harris' handwriting. (Doc # 49, Pg ID 553-54, 592-93, 595) Hiller further testified that Harris had personally delivered handwritten letters to her in the past, which were similar in style and form to the writing in the letter to Congresswoman Miller. The Government also called several scientists who tested samples of envelopes and letters written by Harris, and introduced their lab reports. The letter to Congresswoman Miller did not

contain Harris' DNA or fingerprints, but it did include Hiller's return address and distinctive handwriting. Harris' DNA was found on two other letters bearing Hiller's return address as well as the same distinctive handwriting as the letter to Congresswoman Miller. Harris' fingerprint was found on a third letter, also written in that same distinctive handwriting. Neither Defense Counsel nor the Government presented testimony from a handwriting expert.

After reviewing the parties' arguments, briefs, and the record, the Court concludes that Defense Counsel's performance with regards to the issue of handwriting investigation was reasonable. The Court finds that Defense Counsel made a strategic choice not to pursue further analysis of the handwriting at issue. The record shows that Harris' writing was very distinctive in handwriting as well as in style and form, and the evidence at trial that Harris was in fact the author of the letter to Congresswoman Miller was strong. In these circumstances, the Government argues, and the Court agrees, that further analysis of the handwriting would have likely been harmful to the Defense. Even if the Court found that Defense Counsel's performance was deficient with regards to this issue, in light of the aforementioned evidence presented to the jury, the Court finds that Harris cannot show that that there is a reasonable probability that, but for counsel's failure to further analyze the handwriting, the jury would have returned a different verdict.

### D. Written Post-Trial Motions

Harris' third argument is that Defense Counsel was ineffective because he filed no written post-trial motions.  Harris asserts that Defense Counsel "barely mentioned the lack of conclusive identity evidence" in his oral Rule 29 motion, focusing on the content of the letter instead.  During closing, however, Harris asserts that Defense Counsel argued strongly that there was insufficient evidence as to identity.  Harris argues that testimony regarding the handwriting—in particular the fact that Hiller testified during cross examination that the style and wording in the letter to Congresswoman Miller was similar to the style and wording in the love letters that Harris personally delivered to her, but that the handwriting was not the same—should have been presented to the Court in a post-judgment motion as a basis for granting a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure, and that the failure to do so deprived him of the opportunity of being acquitted post-trial.

The Government argues that Defense Counsel was not ineffective because he did make an impassioned oral motion for judgment of acquittal arguing that the letter did not constitute an actual threat to Congresswoman Miller and that there was insufficient evidence of who wrote the letter.  The Government further argues that—because of the distinctive writing of Harris, because the witness testimony concerning the handwriting was the main issue at trial, and because the issue was

addressed and rejected by the Sixth Circuit—Harris cannot demonstrate that if Defense Counsel had raised an additional, written post-trial motion, the result of the proceedings would have been different.

To establish ineffective assistance of counsel, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  *Strickland*, 466 U.S. at 689.  "Trial strategy includes the decision not to file certain motions if, after investigation, doing so would not be necessary or advantageous."  *United States v. Hinds*, 2 Fed. App'x 420, 423 (6th Cir. 2001).

At the close of the Government's case in chief, Defense Counsel made an oral motion for judgment of acquittal.  (Doc # 49, Pg ID 605)  Defense Counsel argued both that the letter did not constitute a serious statement expressing intent to injure, and that there was insufficient evidence to establish that Harris wrote the letter.  *Id.* at  605-08.  The Government replied.  The Court denied the motion, finding that, viewing the evidence in the light most favorable to the Government, the evidence established that the letter contained a threat to kidnap or injure a person, and that the case should be presented to the jury for determination of whether Harris was the author and sender of the letter.  *Id.* at 610-12.

The jury returned a unanimous verdict finding Harris guilty of mailing a threatening communication.  (Doc # 48, Pg Id 463)  The jury was then polled at Defense Counsel's request.  *Id.* at 464.  Defense Counsel made no further motions.

Harris filed a Notice of Appeal on March 10, 2014.  (Doc # 42)  On May 13, 2015, the Sixth Circuit issued an Opinion affirming Harris' conviction and sentence.  (Doc # 51)  In his appeal, Harris challenged the testimony of Herrera, Hiller, and Orsette, arguing that it violated Federal Rule of Evidence 701 and impermissibly encroached upon the jury's duty to determine whether Harris wrote and sent the threatening letter.  *Id.* at 626.  The Sixth Circuit found that the testimony complied with Federal Rules of Evidence 701 and 901(b)(2).  *Id.* at 631-32, 634.  The court noted that the jury was able to assess the weight to give the testimony of Herrera, Hiller, and Orsette because they were aware of how the witnesses came to their conclusions, and "[e]qually as important, the jury was free to come to a different resolution of this fact issue precisely because many of the writings upon which the witnesses based their familiarity had been admitted into evidence."  *Id.* at 635.

After reviewing the parties' arguments, briefs, and the record, the Court concludes that Defense Counsel's performance with regards to the issue of written post-trial motions was reasonable.  The Court finds that after having made an oral motion for judgment of acquittal which included the argument that there was

insufficient evidence to establish that Harris wrote the letter, Defense Counsel made a strategic choice not to pursue further motions.  Herrera, Hiller, and Orsette all identified Harris as the author of the letter based on their familiarity with his distinctive writing.  Many of the writings upon which they based their familiarity were admitted into evidence.  Forensic lab reports found Harris' DNA on two letters bearing Hiller's return address as well as the same distinctive handwriting as the letter to Congresswoman Miller.  Harris' fingerprint was found on a third letter, also written in that same distinctive handwriting.  Under these circumstances, the Court finds that Harris cannot overcome the presumption that Defense Counsel's decision not to file a written post-trial motion was sound trial strategy because doing so would not be advantageous.  Even if the Court found that Defense Counsel's performance was deficient with regards to this issue,  in light of the aforementioned evidence, the Court finds that Harris cannot show that that there is a reasonable probability that, but for counsel's failure to file a written post-trial motion, the result of the proceedings would have been different.

### E. Prosecutorial Misconduct

Harris' final argument is that his sentence should be vacated because the Government failed to disclose a report from the Michigan State Police regarding identifying impressions on the various letters which were introduced as evidence at trial.  Harris argues that the evidence was material and should have been disclosed

to the defense.   Harris asserts that the prosecutor denied the existence of this report, and that the non-disclosure coupled with the denial amounted to prosecutorial misconduct and prejudiced Harris.   Harris notes that he has a Freedom of Information Act request to the FBI pending in order to ascertain whether further analysis of the relevant documents was requested or performed by the FBI.

The Government argues that this report and the information contained in the report were not used as evidence at trial, and that the report does not indicate any definitive results or reach any conclusions concerning the handwriting in the letters.   Further, the government argues that the report is not in any way exculpatory, and Harris does not demonstrate how the report would have likely had a bearing on the outcome at trial.   The Government asserts that the omission of the report is harmless error, and that this issue was not previously presented for review on direct appeal.

To warrant vacating a sentence based on a claim of prosecutorial misconduct, the conduct complained of must be "so egregious so as to render the entire trial fundamentally unfair." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotations omitted).   The court must decide whether the prosecutor's misconduct likely had a bearing on the outcome of the trial in light of the strength of the competent proof of guilt.   *Id.*  The court must apply the harmless

error standard and examine the fairness of the trial, not the culpability of the prosecutor. *Id.*

During trial, FBI Special Agent Herrera testified that there is no handwriting expert that can testify that the writing on the letter to Congresswoman Miller was done by Harris.  (Doc # 49, Pg ID 492)  Herrera testified that the FBI did not forensically analyze the handwriting on the letter.  *Id.* at 490-92.  Later, Michigan State Police forensic scientist Jody Corsi testified that the letter was in the Questioned Documents Unit before she received it for DNA testing in the Bio Unit.  *Id.* at 514.  Corsi testified that the Questioned Documents Unit examines "handwriting and impressions of questioned documents."  *Id.* at 515.  Corsi then stated that she "believed" the handwriting on the letter had been analyzed by the Questioned Documents Unit.  *Id.* at 515, 518.  Corsi stated that she did not  know the results of any examination by the Questioned Documents Unit, and that she did not know if a handwriting sample from Harris would be necessary to compare the handwriting.  *Id.* at 518.  During closing rebuttal, the Government stated:

> The Defense also made an issue and he has told you that the evidence was submitted for handwriting analysis by the FBI to perform.  That was not the evidence.  There was absolutely no testimony in this case that it was submitted for handwriting analysis.  And let me tell you why.  The reason why is because we want you to look at these and based upon your own common sense and knowledge you're going to see these letters were all the same.  You don't need an FBI handwriting analyst or expert to tell us that.

(Doc # 48, Pg ID 430)

After the trial, Harris obtained a laboratory report from the Michigan State Police Forensic Science Division through a Freedom of Information Act request. (Doc # 60-2)  This report was not disclosed to Harris prior to trial, nor was it used as evidence at trial.  A review of the report shows that several envelopes, letters, and papers "were examined for the presence of any indented writing, typing, or other identifying impressions.  These are impressions sometimes left on paper from writing, typing, or other markings done on another page while it was superimposed over the questioned material."  *Id.* at 685.  The documents included the envelope and letter to Congresswoman Miller, which were marked as items Q9 and Q9-1. *Id.* at 684.  The examination of these two items revealed impressions that were sourced to item Q1-1.[1]  *Id.* at 686.  Additional indecipherable impressions were also located on Q9-1.  *Id.*  Item Q1-1 in turn had impressions sourced to item Q4-1,[2] which in turn had impressions sourced to item Q3-1[3] and Q3-2.[4]  *Id.* at 685. Item Q3-1 had impressions sourced to item Q3,[5] and item Q3-2 had impressions sourced to Q3 and Q3-1.  *Id.*  The report reached no conclusions, and included the

---

[1] Item Q1-1 is a sheet of lined yellow paper, with a torn lower left corner and writing beginning, "P.S. take us very seriously . . .," not dated.

[2] Item Q 4-1 is a sheet of lined yellow paper, with a torn top left corner and tear in the lower left edge, with writing beginning, "All of us from . . .," not dated.

[3] Item Q3-1 is a sheet of lined yellow paper, with writing beginning, "Cynthia and family . . .," not dated.

[4] Item Q3-2 is a sheet of lined yellow paper with two tears in the lower left corner and writing beginning, "patty jackson 59 . . .," not dated

[5] Item Q3 is a white personal size envelope, addressed in writing to "pontiac high School," return address, "150 Kent," not postmarked and containing 2 small torn pieces of yellow lined paper adhered to the inside.

following remark:  "In the event that a handwriting examination is desired, the original questioned documents should be submitted to the investigating agencies Questioned Document Unit."  *Id.* at 686.  Harris now has a Freedom of Information Act request to the FBI pending in order to ascertain whether further analysis of the relevant documents was requested or performed by the FBI.  (Doc # 60-3)

In this case, the Court finds that the nondisclosure of the report analyzing impressions had little potential for misleading the jury or prejudicing Harris.  The Government argues, and the Court agrees, that the results are not exculpatory.  Rather, the results suggest that the identifying impressions were caused by the documents being stacked when written, which in turn suggests that Harris was the writer of the stack of documents.  The Court further finds that the competent proof of Harris' guilt was abundant as discussed above.  Applying the harmless error standard, the Court concludes that the Government's failure to disclose the report analyzing the impressions was not so egregious so as to render the entire trial fundamentally unfair.

Regarding the pending Freedom of Information Act request, the Court cannot speculate as to the existence of any further handwriting examination, or whether results of any further handwriting examination, if performed, may be exculpatory.  The Court's decision is based on the record.  FBI Special Agent Herrera testified that the FBI did not perform a handwriting analysis in this case.

Corsi's testimony that she believed a handwriting analysis may have been performed was equivocal; she did not work in the Questioned Documents Unit, nor did she know what handwriting analysis would even entail. The record indicates that no handwriting examination was performed. The Court concludes that Harris cannot establish that any prosecutorial misconduct likely had a bearing on the outcome of the proceedings in light of the strong and competent proof of Harris' guilt.

### F. Summary

Based on the above analysis, the Court finds that Harris failed to show that his trial counsel's performance was deficient under either prong of the *Strickland* test. The Court further finds that Harris failed to show prosecutorial misconduct warranting reversal of his conviction. Harris is not entitled to relief under 28 U.S.C. § 2255.

## III. CERTIFICATE OF APPEALABILITY

Rule 22 of the Federal Rules of Appellate Procedure provides that an appeal may not proceed unless a certificate of appealability is issued under 28 U.S.C. § 2253(c)(2). Rule 11 of the Rules Governing Section 2255 Proceedings requires that a district court issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."

28 U.S.C. § 2253(c)(2).   If a court issues a certificate of appealability, the court must state the specific issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2).   28 U.S.C. § 2255(c)(3); Fed. R. App. P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir. 1997).

      For the reasons set for above, a certificate of appealability will not be issued in this case since the arguments raised by Harris in his Section 2255 Motion are without merit.

## IV. CONCLUSION

      For the reasons set forth above,

      IT IS ORDERED that the Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 **[Criminal Case No. 13-20314, Doc # 54, filed December 9, 2015]** is **DENIED**.

      IT IS FURTHER ORDERED that the Motion to Vacate, Set Aside or Correct Sentence under 28 U.S.C. § 2255 **[Civil Case No. 15-14290]** is **DISMISSED with prejudice.**   The case is designated as **CLOSED** on the Court's docket.

      IT IS FURTHER ORDERED that a certificate of appealability not issue in this case.

Dated:  March 22, 2017           s/Denise Page Hood
                                        Chief, U.S. District Court

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 22, 2017, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager